EFFIE BRUCE ANDERSON, MAY OSBORNE, JENNIE SHARPE
    HENRY (*nee* Sharpe), LYDIA SPRING OSBORNE (*nee*
    Spring) and FLORENCE McKIRGAN.

*v.*

AUGUSTUS F. EGGERS, executor of Mina Stager, AUGUST KONIG,
    FERDINAND KONIG, MAX KONIG, HUBERT KONIG and HUL-
    DAH KONIG ORTLEPP.

[Submitted December 1st, 1900.  Decided December 15th, 1900.
Filed June 4th, 1901.]

1. Complainants were associated together to give aid to deserving poor
people.  The testatrix whose will was here attacked was among their
beneficiaries.  From 1891 to 1900, the year of her death, they had given
her food, money, clothing and medical and personal attention.  Testatrix
had always declared that she was poor and destitute of all support save
that furnished by complainants.  In 1896, complainants, suspecting that
testatrix had money, or the expectation of receiving some, requested her
to make a will in their favor, which she did.  At the time it was stated
that the will was made in consideration of what complainants had there-
tofore done for testatrix and would do thereafter.  This will was subse-
quently destroyed by the testatrix, and a new one made, giving her prop-
erty to others, without the knowledge of complainants.  At testatrix's
death she was shown to have had nearly $4,000 deposited in bank, most of
which had been under her control during the ten years next before her
death.  Complainants sought to enforce a contract on the part of testa-
trix to give her property to them by will.—*Held*, that what complainants
had done for testatrix furnished a consideration for her making a will in
their favor, since the executor was estopped by reason of the fraudulent
representations of the testatrix, as she herself would have been, from set-
ting up as a defence to an action for the value of these services the fact
that they were mere gifts, not constituting a consideration.

2. Where complainants, relying on a will made in their favor, rendered
charitable services to testatrix, the latter could not recede from the prom-
ises made by the will, though there was no binding agreement on the part
of the complainants to continue such services.

3. Where complainants rendered charitable services to one who made a
will in their favor, they did not lose any rights under the will of testatrix
by accepting as security for their ministrations an instrument which they
knew was revocable by her.

4. Testatrix, presumably a very poor woman, at the request of com-
plainants, who had assisted her for a long time, made a will in their favor.

Anderson *v.* Eggers.

The will was twice read to her. She had said to witnesses that she had talked with the complainants about it and wished to make it. She admitted to another witness that she had made the will, and never alleged any undue influence. Complainants were shown to have had nothing more than a suspicion that she was not a poor woman.—*Held,* that under these facts no undue influence was shown.

On final hearing on bill, answers and proofs.

*Mr. William H. Osborne,* for the complainants.

*Mr. Adrian Riker,* for the defendant Eggers.

*Mr. Egbert J. Tamblyn,* for the other defendants.

PITNEY, V. C.

The object of this bill is to enforce a contract to give by will. The contracting parties were the five female complainants, on the one side, and the testatrix, Mina Stager, on the other.

The facts in the case are simple, and entirely undisputed.

The complainants, during the time covered by the transactions displayed by the evidence, were young ladies of a benevolent disposition, who, about the year 1891 or 1892, associated themselves into a society (unincorporated) called "The Ever Ready Circle of King's Daughters," whose object was to succor and solace deserving poor people. To that end they raised money in various ways, principally by preparing articles for sale at fairs, and by giving dramatic entertainments and the like. They had an acquaintance, a Mrs. Drummond, who herself was much engaged in looking after poor and deserving persons, and had among her beneficiaries the testatrix, Mrs. Mina Stager, who was infirm and advanced in years, and represented herself to Mrs. Drummond as being entirely poor, without any pecuniary means whatever, entirely dependent upon her own exertions, and without any friends whatever to assist her. Mina Stager kept house in three rooms in the city of Newark, and so far as she was able supported herself by sewing, but at the time of the formation of the complainants' circle she had become so far helpless as to be unable to earn anything even by sewing, and

Anderson v. Eggers.

declared herself to be perfectly dependent upon the charity and assistance of others.

Mrs. Drummond introduced the complainants to Mrs. Stager, and recommended her to them as an object worthy of their benevolent practices. They took her up as such about the year 1891 or 1892, and administered to her from that time until her death in January, 1900, by giving her $4 every month to pay her rent; by carrying her articles of clothing and food; by leaving orders at a provision store in the immediate neighborhood to furnish her with certain articles of food, including milk; by furnishing her with a holiday dinner three or more times a year; by furnishing her with medical attendance; by taking her out driving and on excursions, and by personal ministrations in the way of visiting her and inquiring after her wants.

During all this time the testatrix frequently expressed her gratitude for these ministrations; her desire to have them continued, and declared that she was entirely poor and had no means of support except those furnished by the complainants.

Mrs. Drummond, on one occasion prior to her introducing the complainants to Mrs. Stager, inquired particularly of her as to whether she did not have some money, and Mrs. Stager stated to her that she had had some money at one time in a savings bank, but declared that she had lost it all and had not a cent left.

In the year 1896 or 1897 the complainants suspected, for what reason does not appear, that notwithstanding Mrs. Stager's protestations of absolute poverty, she did have some money or means, or expectation to receive such, and asked her to make a will in their favor. This she readily agreed to do, and in the month of June, 1897, she made a will giving all her property of every kind to the complainants by their individual names. The will was duly executed in the presence of two witnesses, and handed by Mrs. Stager to Mr. Osborne, then the fiance of one of the complainants, and now her husband, to keep for her.

Mr. Osborne gave Mrs. Stager a copy of the document.

At the time of the making of the will it was distinctly stated and declared that it was made in consideration of what the complainants had theretofore done for Mrs. Stager, for what they were then doing for her, and for what they thereafter expected

to do for her, and it abundantly appears that what they did thereafter was done upon the strength of it.

Subsequently, several months later, she asked to have the will returned to her, stating that she did not like to have it out of her own possession and wished to keep it between the mattresses of her bed. The will was returned to her.

She then called in the defendant Eggers (who had known her and her husband in his lifetime for many years and took an interest in her, and all the time, as he declares, had been told by her that she was perfectly poor, and on the strength of her poverty, had obtained from him small sums of money), and told him that she had expectation of some money from her friends in Germany, and that she wanted to make a will. She then made a new will giving her property to her brothers in Germany, the other defendants herein; and in the presence of Mr. Eggers destroyed the will she had made at the instance of the complainants.

The destruction of that will, and the making of a new one, were concealed from the complainants, and they continued, as we have seen, their ministrations to her up to the time of her death, which occurred on the 23d of January, 1900. At that time there was due the rent for the current month of January, 1900, and the executor continued the possession of the premises so long that he was obliged to pay also the rent for the month of February.

At Mrs. Stager's death it was discovered that she was possessed of two savings bank books, one in the German Savings Bank, amounting to $77.23, the other in the Security Savings Bank, upon which was due at the time of her death the sum of $3,729.91. Her inventory amounted to $3,828.77.

An examination of her book with the Security Savings Bank, which was offered in evidence, furnishes abundant evidence that she knew that she had the deposit there. The book commences in August, 1884, with $1,300 deposited, and further deposits are made later; the interest is added from time to time in different handwritings, showing that they were entered on the book every six months. On September 2d, 1892, she deposited $236; on February 19th, 1895, she deposited $150; all this

Anderson *v.* Eggers.

in addition to the interest which accrued from time to time and there put to her credit. Besides that, she drew her semi-annual credits of interest on three occasions—in 1897, 1898 and 1899.

Upon these facts the complainants found their claim to relief.

It is urged by the defendants that there was here no consideration for this will which had accrued at the time it was made; that the ministrations of the complainants were benevolent in their character, mere gifts, and hence would not create a cause of action nor a legal consideration for a contract, and that a consideration is necessary in cases of that kind, as held in *Drake* v. *Lanning, 4 Dick. Ch. Rep. 452.*

The answer made by the complainants to that argument is this: that all the ministrations prior to the date of the will were made upon the supposition and belief, arising from the positive declarations and statements to that effect made by Mrs. Stager, that the testatrix was an entirely poor person, without any pecuniary means or friends, disabled by age and infirmity to earn a living, and that, therefore, she was a worthy object of benevolence; and that the declarations of the testatrix in that respect were so far untrue as to be fraudulent; and they argue that if a person, by false representations of poverty made to a party, procures a gift from that party and is sued therefor, the defendant is estopped from setting up that it was a mere gift. Hence, complainants argue, at the date of this will—June, 1897 —had it been disclosed to them that the testatrix was possessed of these moneys and was, therefore, not deserving, they might, at their option, have brought an action at law against her for services rendered, moneys lent and goods furnished, to which she could not have set up as a defence that they were done and rendered as benevolences. Hence, they say, that what they had already done for her furnished a consideration for her promise to make a will, and for the making of it.

I am inclined to think that the complainants' point is well taken.

But the complainants rely also upon what they did after the promise to make the will and the making of it, up to the time of her death, and it is abundantly shown that what they did afterwards was done in reliance upon the will. It is true that

Anderson *v.* Eggers.

at the time of the making of the will there was no positive binding agreement on their part to continue their ministrations, but a binding agreement on the part of the beneficiaries in such a case is not necessary. It is sufficient if upon the promise of testamentary disposition in anticipation of services to be rendered those services are afterward actually rendered upon the strength of such promise. If services are so rendered, the promisor will not be permitted to recede from his promise.

Again it is urged by the defendants that the complainants accepted as a security for their ministrations an instrument which they knew was revocable by the testatrix. But that is true of all the numerous instances found in the reports of promises to make a particular disposition by will. The essence of the promise is that the will·shall exist at the death of the testator, and be his or her last will. Without such implied provision in the promise it is entirely idle. The object of using the machinery of a will rather than an irrevocable disposition is that the testator thereby retains the use of the estate during his life, and the power to revoke in case the beneficiary does not fairly fulfill the just expectations of the testator. But· such reserved power cannot be exercised in such manner and under such circumstances as to work injustice to the beneficiary whose conduct has been influenced by the promise to give by will. Although the testator in such cases acts as a judge in his own cause, he must still determine justly.

Numerous examples of this principle are found among the adjudged cases. *Van Dyne* v. *Vreeland, 3 Stock. 370; S. C., 1 Beas. 142,* is one. There the promise was made by the defendant to the father of the complainant, while an infant, to adopt the complainant and treat him as his son and give him all his property at his death. There was no promise on the part of the complainant to do anything, but he actually served his adopted father for many years; and the court enforced the contract by enjoining the defendant, the promisor, from making any disposition of his property to a point beyond his own lifetime.

A case much in point with the present is that of *Loffus* v. *Maw, 3 Giff. 592;* also reported in *8 Jur.* (*N. S.*) *607.* and *32 L. J. Ch. 49.* (I have used the latter report.) The head-note is this:

Anderson *v.* Eggers.

"Where a niece has been induced to\render valuable services to her uncle on the faith of his representation that by so doing she would become entitled to the benefit of the trusts created in her favor by a codicil to his will, and the testator afterwards revoked such trusts, it was held that he had no right to make such revocation, and a decree was made that the trusts in favor of the niece declared by such codicil should be performed."

In that case the testator executed the codicil and showed it to the complainant, and on the strength of it she continued to serve him. The case was elaborately argued before and decided by Sir John Stuart, vice-chancellor. After remarking upon the necessity in cases of this kind of clear proof of the representation (promise), the learned vice-chancellor says: "Anything vague or indistinct in its nature would prevent the right to relief, *but in the present case the codicil is adduced as evidence in writing of the fact of the representation, and for that purpose it is perfect evidence. In cases of this kind a representation that the property is to be given by a revocable instrument is binding. It is the law of the court which makes it binding, although it be of the essence of the representation that the instrument is to be of a revocable nature. No evidence of the representation can well be stronger than the actual preparation and production of the instrument, whether revocable or not,* and where the preparation and production and execution of the instrument all take place for the purpose of influencing the conduct of the other party who acts upon it, the principle applies in its full force." Then, again: "In cases of this kind, where the testator is bound by the effect of his representation, he cannot defeat the right to relief by bequeathing or devising the whole of his property to another person. Whoever claims under the will or codicil takes as a mere volunteer, and cannot escape the effect of any act of the testator which has bound the property in his lifetime. The testator's representation in this case, and any other case within the application of the doctrine, binds the property which he devised to the plaintiff as completely, according to the law of this court, as if he had bound himself in consideration of money not to revoke the gift, and had made the person named in his will a purchaser of the property devised."

In the case in hand the desire and expectation of Mrs. Stager

to have the ministrations of the complainants continue is perfectly clear, and the making of the will in their presence operates, as did that of the codicil in *Loffus* v. *Maw,* as a representation or promise, and here, as there, the complainants have acted upon the strength of the existence of the will made in their favor, and it was not competent for the testatrix to change that in favor of her relatives, who, as remarked in *Loffus* v. *Maw,* are mere volunteers.

If the complainants, after the making of the will had ceased their ministrations, or had in any way failed to do for Mrs. Stager what she had a reasonable right to expect they would do, the case might be different, but, as I have already stated, although the complainants were much embarrassed in proving what they actually did for her up to the time of her death, I think the evidence is sufficiently clear that they did continue the ministrations with fully sustained liberality up to the last. At any rate, no complaint was ever made of any default on their part by Mrs. Stager.

It is further urged by the defendants that the will in complainants' favor was obtained by undue influence.

I am unable to find any evidence in support of this contention. The will was twice read over to the testatrix in the presence of two witnesses who witnessed it and have testified, namely, Mr. Henry and Mr. Osborne, and the testatrix declared that she had previously talked with the complainants about it and that she wished to make it. A copy was left with her. She afterwards stated to Mrs. Drummond that she had made it, and she did not state to Mr. Eggers as a reason for destroying it that she had executed it under any pressure on complainants' part, or that she had been tricked into its execution. In fact, all that was said by Mrs. Stager to Mr. Eggers is entirely consistent with, and accounted for by the admitted fact that she was all the while concealing from the complainants, as well as from Eggers, the fact that she possessed this little fortune. One remark testified to by Mr. Eggers is significant. After speaking of her expectation concerning the German fortune, she said: "Now, they [the complainants] have never given me much, and I don't want them to have that money." Neither in the answer

nor in the production of the evidence was there any hint of this defence of undue influence, which first appears in the written argument of counsel.

The only shadow of ground for imputing bad faith to complainants, and it is but a shadow, is found in the fact that they did not disclose to Mrs. Stager the suspicions which they entertained of her being less destitute than she represented herself to be. But surely she, who was all the while practicing upon the complainants and Mr. Eggers a most despicable fraud—one which, when discovered, made them as well as Mr. Eggers, subjects of merriment among their friends—could not complain of that reticence on their part. There is nothing in the case from which it can be inferred that complainants had anything more than a mere suspicion. In that situation what could they do more consistent with their common benevolent purposes than what they did do? It was idle to question Mrs. Stager any further upon the subject. She had already been well probed by Mrs. Drummond, and had frequently declared to the complainants her utter destitution. It was almost a crime to continue their ministrations if she were not the worthy object they supposed her to be. If, on the other hand, she was what she pretended to be—helpless and entirely poor—then it was cruel to abandon her. In this situation they determined to ask from her a testamentary disposition in such shape as to secure their reception of whatever property she might die possessed of. If there was none, no harm would be done. If there was a comparatively small amount, they would be justly entitled to it; and if there was a large sum, then she would be proven to have been all the time a frauddoer and at last be overcome with her own weapons. It is quite plain that she all the while intended to procure from complainants a comfortable living and the solace of their frequent visits and sympathizing ministrations, and, in the end, to defraud them by destroying the will and making another. The question is whether she can succeed. I think not. I think she was justly meshed in her own net, and that the complainants' case is as meritorious in morals as it is well founded in equity.

The amount which the complainants will receive seems large

in comparison with their actual outlay, but here two considerations come in, first, the length of the time that they were liable to be obliged to serve Mrs. Stager was at the time of the arrangement uncertain. She might have lived many years longer than she did. And, in the second place, they rendered to her services of personal ministrations of solace and social visits, the value of which to a lonely widow without any near relatives is hard to measure in money.

I will advise a decree for complainants. The defendant Eggers will account for the estate in this court, where all just allowances will be made, including his costs and a reasonable counsel fee.